IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JOHN M. EASTMAN,                           :
                                           :
                    Plaintiff,             :        CIVIL ACTION NO. 13-760
                                           :
        v.                                 :
                                           :
LACKAWANNA COUNTY, COREY                   :
O'BRIEN, and JIM WANSACZ,                  :
                                           :
                    Defendants.            :

**MEMORANDUM OPINION**

Smith, J.                                                   March 6, 2015

The First Amendment generally prohibits public employers from taking adverse employment actions against an employee based on their political affiliation if the employee is not in a policy-making or advisory position. In this action, a former director of public works for Lackawanna County has sued the county and two of the three county commissioners because they allegedly violated his First Amendment right of freedom of association when they terminated his employment with the county and replaced him with an individual that associated politically with one of the commissioners. The defendants have moved for summary judgment claiming that, *inter alia*, (1) the plaintiff has failed to produce sufficient evidence to establish a *prima facie* case of political patronage discrimination, (2) the defendants would have reached the same decision regarding the plaintiff's employment regardless of his engaging in protected activity, and (3) the plaintiff's claims against the commissioners are barred by the doctrines of qualified immunity and legislative immunity. After reviewing the applicable record, the uncontroverted evidence demonstrates that the plaintiff associated himself politically with the

two commissioners and, as such, the plaintiff cannot establish a *prima facie* case of political patronage discrimination. Accordingly, the court will grant the motion for summary judgment.

## I.   PROCEDURAL HISTORY

The plaintiff, John Eastman, commenced this action by filing a complaint on March 25, 2013, against the defendants, Lackawanna County, Corey O'Brien ("O'Brien"), and Jim Wansacz ("Wansacz"). Doc. No. 1. The case was originally assigned to the Honorable Christopher C. Conner. The defendants filed an answer to the complaint on May 28, 2013. Doc. No. 12. The defendants filed a motion for summary judgment, statement of undisputed material facts, appendix, and supporting brief on March 7, 2014. Doc. Nos. 23-26. After Chief Judge Conner granted the plaintiff's motion to exceed certain page restrictions on March 24, 2014, the plaintiff filed a counter statement of facts, appendix, and brief in opposition to the motion for summary judgment. Doc. Nos. 29-34. The defendants then filed a response to the plaintiff's statement of facts and a reply brief on April 10, 2014. Doc. Nos. 35, 36.

On August 13, 2014, Chief Judge Conner recused himself from the case and stayed the matter pending redesignation to a district judge outside of the Middle District of Pennsylvania. Doc. No. 39. The Honorable Theodore A. McKee of the United States Court of Appeals for the Third Circuit reassigned the case to the undersigned on September 4, 2014. Doc. No. 40.

## II.   DISCUSSION

### A.   <u>Factual Record</u>[1]

Three elected commissioners run the Lackawanna County government. Pl.'s App. of Exs. in Connection with Pl.'s Opp. to Defs.' Mot. for Summ. J. ("Pl.'s App.") at Ex. 4, Oral Dep.

---

[1] The court has attempted to properly compile the applicable record for purposes of this motion. Unfortunately, the parties' (in particular, the plaintiff's) statements of material facts and responses thereto are unnecessarily argumentative and, at times, even attempt to contradict uncontroverted evidence in the record. Additionally, to the extent that the court refers to information in the record that is not included in this recitation, the court's additional references to the record later in this opinion are incorporated herein.

2

of Patrick M. O'Malley ("O'Malley Dep. Tr.") at 5. The commissioners always include two members from one political party and one commissioner from the other party. *Id.* After the election in November 2007, O'Brien and Michael Washo ("Washo"), were two of three individuals sworn-into office in January 2008 as county commissioners in Lackawanna County. Pl.'s App. at Ex. 1, Rule 30(b)(6) Deposition of Lackawanna Cnty. by and Through its Designee, Maria Elkins ("Elkins 2013 Rule 30(b)(6) Dep. Tr.") at 28.

In early 2008, and shortly after the county commissioners were sworn into office, Lackawanna County opened up the hiring process and allowed members of the public to apply for a variety of positions in the county. Pl.'s App. at Ex. 3, Rule 30(b)(6) Dep. of Lackawanna Cnty. by and Through its Designee, Elizabeth Randol ("Randol 2009 Rule 30(b)(6) Dep. Tr.") at 96-97. Thus, a large number of Lackawanna County employees, including almost all of the cabinet-level or director-level employees, had to reapply for their positions if they wanted to keep their jobs. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 28. As part of this process, the county terminated the employment of numerous existing employees and hired numerous new employees. *Id.* The county's termination of then-existing county employees resulted in various lawsuits against the county. *Id.* at 70.

During the 2008 hiring and firing period, the county created a director-level position for the director of public works. Randol 2009 Rule 30(b)(6) Dep. Tr. at 100-01.[2] This position was also a cabinet-level position in the county. Defs.' App. of Exs. in Supp. of Their Mot. for Summ. J. ("Defs.' App.") at Ex. A, Oral Dep. of John Eastman ("Eastman Dep. Tr.") at 32. On January 22, 2008, the county hired the plaintiff as the director of public works at an annual salary of

---

[2] In addition, the county eliminated the director of buildings and grounds and created a deputy director of buildings and grounds position. Randol 2009 Rule 30(b)(6) Dep. Tr. at 100, 106-07; *see also Bell v. Lackawanna Cnty.*, 892 F. Supp. 2d 647, 680 (M.D. Pa. 2012) (discussing county's elimination of department of building and grounds and creating positions of deputy director of maintenance and deputy director of roads and bridges, both of whom reported to the newly-created position of director of public works).

$62,000. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 47, 48; Eastman Dep. Tr. at 30; Defs.' App. at

Ex. B, January 16, 2008 Lackawanna Cnty. Salary Bd. Meeting Minutes; Defs.' App. at Ex. C,

Lackawanna Cnty. Personnel Report.   The plaintiff has a bachelor's degree in business

administration, operations management from Penn State University, and a master's degree in

engineering, environmental pollution control, and facilities management also from Penn State.

Eastman Dep. Tr. at 6-7. The plaintiff is also a licensed plumber and electrician. *Id.* at 7-8.

As Lackawanna County's director of public works, the plaintiff's activities, duties, and

accomplishments were as follows:

- He participated on the selection and design team for office space for magisterial district justices. Eastman Dep. Tr. at 38. Although he did not fully negotiate the lease, he did discuss the range that the county typically pays for its leases with the landlord. *Id.* at 39.

- He participated in cabinet meetings on an at least monthly basis. *Id.* at 32.[3]  As part of his duties, he would prepare cabinet meeting reports prior to the meetings. *Id.* at 34.

- He worked with the county architect and engineer in preparing bid specifications for county projects. *Id.* at 35. He would also review the bids with the architect and engineer to ensure that they complied with the specifications. *Id.* at 35, 36, 37.[4]

- Although FEMA initially determined that the county was ineligible for funding for certain bridge and road repairs, he worked with FEMA and eventually caused FEMA to change course and provide about a million dollars in funding to the county. *Id.* at 40, 41, 62-63. This also included the plaintiff working with various municipalities to try to get them the FEMA funds. *Id.* at 41.

- He oversaw, developed, and maintained over thirty county site locations including office buildings, facilities, grounds, roads, bridges, and the recycling department. *Id.* at 44-45; Elkins 2013 Rule 30(b)(6) Dep. Tr. at 34, 35.[5]

- He directed one deputy director, Larry Lukasik, one manager, Marnie Palmer, and supervised 35 employees and subcontractors covering three departments. Eastman Dep. Tr. at 46-47. The three departments included the department of roads and bridges, the

---

[3] The plaintiff indicated that the cabinet meetings were "so the right hand and the left hand knew what [they] were doing within the county." Eastman Dep. Tr. at 34.
[4] The lowest bidder typically won the job. Eastman Dep. Tr. at 37.
[5] The recycling department was not a recycling center; instead, it was an educational program. Eastman Dep. Tr. at 45. The plaintiff was in charge of the department's two employees. *Id.* The county eventually retitled this department as the office of environmental sustainability. *Id.*

department of maintenance, and the office of environmental sustainability. *Id.* at 45-46, 132-33.

- He "was the project manager for the county. [He] represented the county." *Id.* at 47.

- He interfaced with various county operating authorities, including the county minor league baseball stadium, trolley museum, nursing home, amphitheater, parks, and the district attorney's office, and acted as the county expert about their various facility construction projects, repairs, and improvement projects. *Id.* at 47-48.

  o For the minor league baseball stadium, he rectified issues with leaks and drainage problems. *Id.* at 48. In addition, through his suggestion, the project included placing boulders (instead of fences) around the stadium for security purposes. *Id.* at 48.

  o For the trolley museum, he guided the rebuilding of the roof structure and he placed people there to ensure that the facility was clean and safe. *Id.* at 49.

  o For the nursing home, he guided the construction of offices in the nursing home. *Id.* at 49.

  o For the amphitheater, he visited that facility on numerous occasions because of issues with the stage, plumbing, and pavement. *Id.* at 49. The facility also had "vending" issues and a problem with snakes. *Id.*

  o For the parks, he directed the placement of a bridge in the park for the walking trail. *Id.* at 49-50.

  o He supervised the updating/modernizing of various county offices. *Id.* at 50.

  o He directed the construction of platforms to allow for the accessibility of various aspects of the courtroom to disabled judges and members of the public. *Id.*

- He worked with the accounting department to prepare budgets for his department, and he also prepared project budgets. *Id.* at 50-51.

- He acted as an "owner representative" for the county at contractor construction meetings. *Id.* at 51-52. He served as the liaison for the county for any issues with the contractors. *Id.* at 52.

- He engaged in regular contact with members of the community regarding issues involving, *inter alia,* flooding and road drainage. *Id.* at 53.

- He, along with the input of the commissioners and the chief of staff, set and monitored department objectives, achievements, and milestones. *Id.* at 53-54, 55.

5

   o  One of the major objectives was making the county buildings much more accessible for individuals with disabilities. *Id.* at 53-54. In this regard, he participated in and supervised the county making the second-floor courtrooms more accessible, installing elevators, and creating areas of refuge for disabled individuals in the event of an emergency. *Id.* at 54.

   o  He was able to initiate the creation of a fire alarm system, which was passed for approval as part of the county budget. *Id.*

- He cured a problem that had lasted for seven or eight years prior to his start as director of public works by fixing a leak in the roof of the administration building. *Id.* at 54. He also was able to persuade the county to replace the roof, and he worked with the commissioners to set aside money for this project. *Id.* at 54-55.

- He served on the county safety committee, which consisted of various department heads. *Id.* at 55. This committee had quarterly meetings to ensure that the county employees and members of the public were safe when they were at county facilities/properties. *Id.* at 55-56. The plaintiff also assisted with the county obtaining defibrillators and getting a stair wheelchair to get people down if there was an emergency. *Id.* at 56-57.

- He served as the county representative on the county continuation of county government committee. *Id.* at 57. He facilitated this committee and "made things happen" such as what would happen if a bridge was out and they needed to get around it. *Id.* at 57-58.

- He developed job-performance standards to ensure that his employees actually worked for the requisite hours per day. *Id.* at 58. He also explained to the employees that they were to use industrial engineering standards, and he created standards for "how much space that is supposed to be cleaned and how many toilets they're supposed to clean in an hour and what they're supposed to look like at the end." *Id.* at 58-59. He developed policies for "when the stairs get cleaned, when the bathrooms get cleaned, when things get done, when pumps ha[ve] to be replaced, what room filters had to be changed and things of that nature." *Id.* at 59. He also implemented standards, policies, and procedures for when items needed repair and when bridges needed to be inspected. *Id.* at 60-61. He wrote out some of the standards and provided them to the employees. *Id.* at 59.[6]

- The county had been having issues with numerous evacuations out of fear of the employees receiving carbon monoxide poisoning, and through his implementation, a company installed a relay system to stop carbon monoxide from entering the county government building. *Id.* at 59-60.

- He approved all purchases, payroll and project specifications within the department's three-million-dollar operating and approximately five-million-plus capital improvement budget. *Id.* at 61-62.

---

[6] The plaintiff was unsure whether he ever reduced the procedures to a written document. *Id.* at 61.

- He estimates that he saved the county taxpayers over $885,000 during his first eight months as the director of public works by implementing job performance standards, energy and utility savings, and product pricing negotiation. *Id.* at 64. This included the plaintiff's assessment that the county should terminate the employment of 10 to 12 employees that were not working enough. *Id.* at 64. The plaintiff recommended the layoffs to the commissioners, and the commissioners followed the recommendation. *Id.* at 64-65. It also included the plaintiff's ability to negotiate with vendors for reduced rates on various pieces of equipment. *Id.* at 65-67.

- He served on the county's labor-management relations board. *Id.* at 69-70. During his last two years of service with the county, the county created this board to address issues with the union regarding employee complaints over such things as the cleanliness and accessibility of the bathrooms and an issue with the work stations in the judicial records department. *Id.* at 69-70.

- He participated in the grievance process for his employees, which included resolving employee complaints and disciplining his employees for not properly performing their jobs. *Id.* at 71, 79, 94. Through this process, he also worked with human resources. *Id.* at 71.

- He submitted recommendations for solutions to policy or reporting problems. *Id.* at 73-74.

- He assigned employees to do work and evaluated the quality of the work performed. *Id.* at 74-75.

- He set the priorities for his employees and trained his employees. *Id.* at 75.

- He served as a team leader, recommended employees for awards, and interviewed individuals for vacant positions. *Id.* at 77-78.

- He recommended individuals for vacant positions, and he participated with human resources and the commissioners with reviewing the applications. *Id.* at 78.

- He approved leave for his employees. *Id.*

- With regard to discharging employees, he would recommend that the county discharge an employee. *Id.* Thereafter, he worked with human resources to terminate the employee. *Id.* at 79. Not all of the plaintiff's recommendations resulted in terminations. *Id.* at 79-80. He had the authority to terminate an employee once the county commissioners approved the termination. *Id.* at 64, 65.

- He served on a six-member search committee to select possible architects or engineers for the county stadium. *Id.* at 80. He also participated in interviews of particular candidates. *Id.* at 81.

- His "job functions [were] a multitude of a lot of things," as he has "corrected engineers, . . . corrected architects[,] . . . redesigned space, . . . redesigned magistrates' offices because of his input and found things wrong." *Id.* at 130.

2011 was an election year for the Lackawanna County Commissioners. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 29. In September 2011, the plaintiff paid $250 to the Friends of Wansacz and O'Brien, the political committee of O'Brien and Wansacz, to participate in a campaign golf outing. Eastman Dep. Tr. at 108, 100, 112, 118. Although the plaintiff recognized that the county had a policy preventing him from being a "vocal" supporter of a candidate, he also recognized that the golf outing was to raise money for the political committee. *Id.* at 109, 114. Although the plaintiff asserts that he attended the events because he wanted to golf, eat a good meal, and network with his "fellow people," he acknowledged that he was there to support O'Brien and Wansacz "because they're going to be your boss." Eastman Dep. Tr. at 108, 114-17. The plaintiff saw Wansacz and O'Brien at the golf outing, and they thanked him for being there. *Id.* at 118. The plaintiff also had his picture taken with them. *Id.* at 118-19.

In November 2011, Lackawanna County held the election for the three county commissioners. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 29. O'Brien and Wansacz, both Democrats, won two of the positions and Patrick O'Malley, a Republican, won the other position. *Id.* at 29, 30; O'Malley Dep. Tr. at 4, 5, 6, 41. O'Brien and Wansacz, as Democrats, constituted the majority commissioners, and O'Malley was the minority commissioner. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 29-30; O'Malley Dep. Tr. at 6.

In December 2011, despite not yet having been sworn into office, Commissioner Wansacz created a search committee that was responsible for reviewing the duties of various county employees. Eastman Dep. Tr. at 100; Defs.' App. at Ex. F, Oral Deposition of Jim

Wansacz ("Wansacz Dep. Tr.") at 14.[7]  The plaintiff met with this committee.  Eastman Dep. Tr. at 100.

The three county commissioners were sworn into office in January 2012.  Compl. at ¶ 22; Answer at ¶ 22; O'Malley Dep. Tr. at 5.  The plaintiff provided The Friends of Wansacz and O'Brien with a check dated January 19, 2012, in the amount of $150.00, for him and his wife to attend the inauguration dinner for O'Brien and Wansacz.  Eastman Dep. Tr. at 119-20.  The plaintiff and his wife attended the inauguration dinner, they saw O'Brien and Wansacz at the event, and O'Brien and Wansacz thanked him for coming and said that it was nice meeting his wife. *Id.* at 120.

Other than the two checks, the plaintiff did not provide any additional money to the campaign of Wansacz and O'Brien, he did not attend any other political events, place signs in his yard, place bumper stickers on his vehicle, work the polls, or make phone calls for them. *Id.* at 121, 161-62.  He did not provide any help to their campaigns other than financial support and attendance at the golf outing. *Id.* at 122.  The plaintiff "probably told" his mother to vote for O'Brien and Wansacz. *Id.* at 122.  The plaintiff also believes that he voted in that election and voted for O'Brien and Wansacz despite not living in Lackawanna County at the time of the election. *Id.*

Shortly after the three commissioners were sworn into office in January 2012, the county announced via letter to some of the existing employees that it was going to place advertisements in the newspaper indicating that it was accepting applications for various positions in the county. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 16; O'Malley Dep. Tr. at 5; Eastman Dep. Tr. at 95; Defs.'

---

[7] O'Brien stated that "after the election of Commissioners Wansacz and O'Malley, before they come in, . . . they should take a fresh look at the county and our cabinet-level employees, the decision-makers, policymaker folks and also anyone who [they] had a question about what it was they did and that we should take a fresh look at those people, because [O'Brien] was the only commissioner remaining."  O'Brien Dep. Tr. at 72.

App. at Ex. E, Oral Dep. of Lackawanna Cnty. Commissioner Corey O'Brien ("O'Brien Dep. Tr.") at 68, 70.[8]  To the extent that those advertisements related to positions that were currently held by county employees, the county advised those individuals that they could submit their resumes and reapply for the positions.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 16; O'Brien Dep. Tr. at 70.[9]  The county did not provide the employees with a reason for why they had to reapply for their jobs; instead, they were told that they were in appointed positions and the county was looking for the most qualified individuals to fill the roles.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 16, 17.

The January 2012 advertisements included advertisements for 28 deputy or deputy director positions and 15 to 20 solicitorships.  *Id.* at 17.  Essentially, all nonunion, noncivil service employees had to reapply to potentially keep their jobs.  *Id.* at 72.

The county advertised the position of director of public works, and the plaintiff was one of the county employees that received a letter from the commissioners inviting him to reapply for county employment.  Eastman Dep. Tr. at 95; Elkins 2013 Rule 30(b)(6) Dep. Tr. at 50.[10]  The letter provided the plaintiff with a number to call if he wanted to interview, and he called the number and the commissioners eventually interviewed him.  Eastman Dep. Tr. at 96.  Prior to the interview, the plaintiff talked to various people about possibly favorably speaking to the commissioners on his behalf.  *Id.* at 97-98.

The plaintiff participated in an interview with the three commissioners in February 2012. *Id.* at 100-01.  The interview lasted approximately 75 minutes.  *Id.*  During the interview, the

---

[8] Both O'Brien and Wansacz stated that part of the interview process was so they (in particular the newly-elected Wansacz) could gain a better understanding of what each employee did in the county.  O'Brien Dep. Tr. at 68, 71; Eastman Dep. Tr. at 100.
[9] In 2009, 2010, and 2011, the county did not require existing employees to reapply for their positions.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 27, 29; O'Brien Dep. Tr. at 70.
[10] The plaintiff received his letter after the inauguration dinner.  Eastman Dep. Tr. at 121.

plaintiff told the commissioners that he was there to help them look good, and he would do his "best to make sure that you always look good and, you know, the buildings, grounds, roads and bridges will be done in an impeccable standard." *Id.* at 103. The commissioners also informed the plaintiff that they were thinking of restructuring his position, "going in a little different direction with you," and possibly reassigning some of his duties. *Id.* at 104.

During the interview process, the commissioners also interviewed Chester Lenceski for the director of public works position. O'Malley Dep. Tr. at 64; Defs.' App. at Ex. H, Oral Dep. of Chester A. Lenceski, III ("Lenceski Dep. Tr.") at 26. Lenceski has a high school diploma, and he had prior work experience as a carpenter and as the head of preventative maintenance for Clarks Summit State Hospital. Lenceski Dep. Tr. at 5-20; Pl.'s App. at Ex. 7, Lenceski Resume. Lenceski had received notice of the job posting via a newspaper posting, and he applied for the job thereafter. Lenceski Dep. Tr. at 23.

Lenceski is a registered Democrat, and prior to the 2011 primary election, he had provided $500 to the Wansacz campaign while attending a fundraising event with his wife at the Scranton Country Club.[11] *Id.* at 38, 40-42. Lenceski had also been to a function for Wansacz when Wansacz previously ran for another political office. *Id.* at 43-44. Lenceski refers to Wansacz as Jimmy, had been to his house for a New Year's Eve party "years ago," and went to high school with Wansacz's wife and is friends with her on Facebook. *Id.* at 47-50.[12]

At some point after the plaintiff's interviews, O'Brien and Wansacz informed their then-chief of staff, Maria Elkins, that they were going to terminate Eastman's employment with the

---

[11] At the time, Wansacz was running with another candidate – Mr. Jeffers – who, unlike Wansacz, was unsuccessful in that year's primary election. Lenceski Dep. Tr. at 40-41. In addition, at the time of the donation, Lenceski's wife was not working and, as explained later, he and his family were living at his mother's home to save money. *Id.* at 43.

[12] Lenceski and his family have lived and continue to live in his mother's home. Lenceski Dep. Tr. at 23-25. Lenceski first met Wansacz when he visited Lenceski's mother's home while he was campaigning for another political office. *Id.* at 44.

county.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 13-14.[13]  O'Brien and Wansacz, as the majority commissioners, could render hiring and firing decisions without input by the minority commissioner, O'Malley.  O'Malley Dep. Tr. at 20-21.  Thus, O'Malley was excluded from all termination decisions.  *Id.* at 30-31.

O'Brien and Wansacz told Elkins to tell the plaintiff of his discharge.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 14.  They also told her that they were going to change the position of director of public works to director of maintenance.  *Id.* at 51.  They did not inform Elkins of the reason for discharging the plaintiff.  *Id.* at 134-35.[14]

In late-March 2012, Elkins informed the plaintiff of his termination.  *Id.* at 39.[15]  Despite the late-March notice, the county permitted the plaintiff to conclude his county employment on April 2, 2012, so he could have the extra month of employment benefits.  Eastman Dep. Tr. at 39, 143; Elkins 2013 Rule 30(b)(6) Dep. Tr. at 53, 56, 57, 60.  At the time of his termination, the plaintiff's annual salary was approximately $65,000.  Eastman Dep. Tr. at 142-43.

In or around the time of the plaintiff's firing, the county commissioners decided to hire Lenceski.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 51, 52, 53, 54; O'Brien Dep. Tr. at 92-95.  In particular, O'Brien and Wansacz signed a request for approval to hire Lenceski that was dated March 28, 2012.  *Id.* at 53, 54, 55; Pl.'s App. at Ex. 8, 3-28-12 Request for Approval of Hire.[16]  The request indicated that the county was hiring Lenceski for the position of director of public

---

[13] Elkins started her employment with the county in 2008 as the deputy director of human resources. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 13.  In February 2009, she became the chief of staff. *Id.*

[14] Elkins did not participate in the early 2012 interview process because her position was "up for interview as well." Elkins 2013 Rule 30(b)(6) Dep. Tr. at 15.

[15] At no point prior to his termination did the plaintiff inform O'Brien or Wansacz that he did not support them politically. Eastman Dep. Tr. at 123.  The plaintiff acknowledges that they would have had no reason to believe that he was not supporting them politically. *Id.*

[16] A majority of the county commissioners make hiring and firing decisions. O'Malley Dep. Tr. at 20-21.  O'Malley was not involved in any meeting during which the commissioners discussed the termination of the plaintiff's employment with the county, and he did not vote on any such termination. *Id.* at 14.  O'Malley learned about the plaintiff's discharge after hearing about it from his secretary. *Id.* at 15.

12

works. Elkins 2013 Rule 30(b)(6) Dep. Tr. at 54.[17]  Lenceski's start date with the county was on

April 3, 2012, and his annual salary was $44,000.  *Id.* at 55, 64; Lenceski Dep. Tr. at 30, 32-33,

36, 55.

During a Salary Board meeting on April 25, 2012, the county (1) eliminated the director

of public works position, (2) created the position of director of maintenance, (3) eliminated the

deputy director of roads and bridges position, and (4) created the position of director of roads

and bridges.  O'Brien Dep. Tr. at 91, 101-04; Elkins 2013 Rule 30(b)(6) Dep. Tr. at 9-10, 38-39;

Pl.'s App. at Ex. 9, Salary Bd. Meeting Minutes for 4-25-12.  Larry Lukasik became the director

of roads and bridges and Lenceski became the director of maintenance.  Eastman Dep. Tr. at 131,

133; O'Brien Dep. Tr. at 95.

## B.  Standard – Motion for Summary Judgment

A district court "shall grant summary judgment if the movant shows that there is no

genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(a).  Additionally, "[s]ummary judgment is appropriate when 'the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law.'" *Wright v. Corning,* 679 F.3d 101, 103 (3d Cir. 2012)

(quoting *Orsatti v. N.J. State Police,* 71 F.3d 480, 482 (3d Cir. 1995)).  An issue of fact is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986).  A fact is "material" if it

"might affect the outcome of the suit under the governing law." *Id.*

---

[17] Elkins explained that the county needed to place Lenceski in the Director of Public Works position first before
eventually changing it to Director of Maintenance.  Elkins 2013 Rule 30(b)(6) Dep. Tr. at 38-39.

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Once the moving party has met this burden, the non-moving party must counter with "'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted); *see* Fed.R.Civ.P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute").  The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson,* 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor.").  Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary

judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109-10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted).

## C.  Analysis

The plaintiff brings the instant action under 42 U.S.C. § 1983, which provides in pertinent part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

*Id.* "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). "The first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citations omitted).

Here, the plaintiff asserts that the defendants discriminated against him because he exercised his First Amendment right of freedom of association.  Compl. at ¶ 49.  The First Amendment, applied to the states through the Fourteenth Amendment, protects individuals' rights to "associate with others for the common advancement of political beliefs and ideas." *Kusper v. Pontikes*, 414 U.S. 51, 56 (1973) (citations omitted).  To establish a *prima facie* case for discrimination on the basis of political affiliation (or political patronage), an employee must prove that "(1) [the employee] was employed at a public agency in a position that does not require political affiliation, (2) [the employee] was engaged in constitutionally protected conduct, and (3) this conduct was a substantial or motivating factor in the government's employment decision." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 271 (3d Cir. 2007) (citation omitted).  If the employee satisfies these elements the governmental entity "may 'avoid a finding of liability by proving by a preponderance of the evidence that the same employment action would have been taken even in the absence of the protected activity.'" *Id.* (quoting *Stephens v. Kerrigan*, 122 F.3d 171, 176 (3d Cir. 1997)).

In the instant motion for summary judgment, the defendants raise six arguments in support of their assertion that the court should grant the motion.  The first three arguments relate to their claim that the plaintiff has failed to establish a *prima facie* case:  First, the defendants claim that the plaintiff has not established the first element of the *prima facie* case because his former position as director of public works for the county required political affiliation and was therefore exempt from First Amendment protection.  *See* Defs.' Br. in Supp. of Mot. for Summary J. ("Defs.' Br.") at 5-10.  Second, the defendants contend that the plaintiff was not engaged in constitutionally protected conduct because he was actually affiliated with O'Brien and Wansacz.  *Id.* at 10-12.  Third, the defendants argue that the plaintiff has failed to produce

16

sufficient evidence to satisfy the third element of the *prima facie* case insofar as he cannot show that his exercise of his First Amendment rights was a substantial or motivating factor in the county's decision to terminate his employment because O'Brien and Wansacz did not know of his alleged non-affiliation with them. *Id.* at 13.

For their fourth argument, the defendants assert that even if the plaintiff has produced sufficient evidence to establish a *prima facie* case of political patronage discrimination, the court should still grant their motion because the evidence demonstrates that they would have reached the same decision to eliminate the director of public works position regardless of whether the plaintiff exercised his First Amendment rights. *Id.* at 14-16.   The defendants' final two arguments relate to immunity issues:   they claim that O'Brien and Wansacz are entitled to qualified immunity and legislative immunity for their actions.

As discussed below, the court has reviewed the evidence of record in the light most favorable to the plaintiff, as the party opposing summary judgment, and has resolved any reasonable inferences in his favor.   Nonetheless, the evidence in the record shows that no fair-minded jury could find in the plaintiff's favor because he cannot establish the second and third elements of a *prima facie* case.

### 1.    The Plaintiff was not Engaged in Constitutionally Protected Conduct

For purposes of this motion only, presuming that the evidence in the record satisfied the first element of the *prima facie* case, *i.e.* that he was employed at a public agency in a position that does not require political affiliation; the plaintiff would also have to show that he engaged in constitutionally protected conduct.   A plaintiff can satisfy the second prong of a *prima facie* political discrimination claim if the plaintiff: (1) "suffers because of active support for a losing candidate within the same political party;" (2) "fail[s] to support the winning candidate;" or (3)

"fail[s] to engage in any political activity whatsoever." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 272-73 (3d Cir. 2007) (citations omitted).

The defendants contend that the plaintiff was not engaged in constitutionally protected conduct because "[i]t is undisputed that [he] was a political supporter of Messrs. O'Brien and Wansacz and actively supported them in the 2011 County commissioners' election." Defs.' Br. at 10. In this regard, they point out that the plaintiff contributed to The Friends of Wansacz and O'Brien, attended a campaign golf outing, voted for them, probably encouraged his mother to vote for them, and attended their inauguration party. *Id.* Because of this undeniable support for O'Brien and Wansacz, the defendants assert that the plaintiff has not implicated any right of non-association that would be actionable and, as such, no reasonable jury could conclude that the plaintiff did not support O'Brien's and Wansacz's campaigns. *Id.* at 10-12.

In response to the defendants' arguments, the plaintiff contends that "[t]he evidence reveals that [he] was terminated for his political non-association with defendants Wansacz and/or O'Brien." Pl.'s Br. at 9. The plaintiff maintains that the First Amendment prohibits the defendants from taking adverse employment actions simply to "make room" for political supporters. *Id.* at 12-14. The plaintiff insists that the defendants violated this principle when they fired him, to make room for and eventually replace him with Lenceski, an individual that supported Wansacz by, *inter alia*, contributing $500 to Wansacz's campaign and attending prior political rallies. *Id.* at 12, 15. He also notes that Lenceski went to high school with Wansacz's wife, went to a New Year's Eve party at Wansacz's home, lives in the same town as Wansacz, and is friendly with Wansacz's wife. *Id.* at 12.

Although the plaintiff recognizes the defendants' references to the alleged incidents of his support to Wansacz and O'Brien, he argues that the Constitution does not require him to

completely support or shun a candidate and, regardless, the evidence demonstrates that he did not actually politically support Wansacz or O'Brien. *Id.* at 15-17.  With regard to the golf outing and $250 contribution to The Friends of Wansacz and O'Brien, the plaintiff notes that he testified at his deposition that he attended the outing merely to play golf, enjoy a meal, and network with contractors that he dealt with on a regular basis. *Id.* at 16.  Concerning the inauguration party, the plaintiff insists that he was there to support his new bosses and doing so does not constitute political affiliation with O'Brien and Wansacz.  *Id.*  He characterizes those instances as "marginal" support and not as "active political associations." *Id.* at 15-16.  Moreover, he claims that those instances are particularly minimal when compared to the "significant political and personal relationship" between Lenceski and Wansacz.  *Id.* at 17.  Therefore, the plaintiff contends that the court should reject the defendants' arguments that he did not engage in constitutionally protected conduct and a jury should determine whether the plaintiff was a political associate of O'Brien and Wansacz. *Id.* at 19-20.

After reviewing the evidence, the court agrees with the defendants that no reasonable jury could possibly find that the plaintiff engaged in constitutionally protected conduct as applicable to this type of political patronage case.[18]  As indicated above, the Constitution protects various forms of association, including the "freedom not to associate." *See Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) ("Freedom of association therefore plainly presupposes a freedom not to associate."); *see also Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987) ("[A] citizen's right not to support a candidate is every bit as protected as his right to support one.").

---

[18] The court recognizes that in essence, the act of supporting Wansacz and O'Brien's campaigns would be a protected form of political activity.  It is only in the nature of this type of case, where the plaintiff is alleging that he was discriminated against because of political patronage, that this type of conduct could not satisfy the second element of the *prima facie* test.

The issue with the evidence in this case is that the plaintiff's right of non-association is not implicated here.

In the first instance, it is undeniable that the plaintiff's campaign contribution to The Friends of Wansacz and O'Brien acts in a manner to associate him with them. *See Buckley v. Valeo*, 424 U.S. 1, 21 (1976) ("Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals."); *see also Fed. Election Comm'n v. Republican Fed. Campaign Comm.*, 533 U.S. 431, 440 (2001) ("Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association."); *Philadelphia Fire Fighters' Union Local 22, AFL-CIO v. City of Philadelphia*, 286 F. Supp. 2d 476, 480 ("A contribution to a political cause constitutes speech and association that the First Amendment protects."). In addition, courts have held that participating in a political function or a campaign rally constitutes political association. *See, e.g.*, *D'Orazio v. Washington Twp.*, No. 07-5097, 2010 WL 3982287, at *5 (D.N.J. Oct. 7, 2010) ("There is no defined quantum of participation that is required to establish a protected political association-courts have found discrimination based on as little activity as 'stuffing envelopes, speaking to individual members of the public, attending political functions and attending at least one campaign rally.'" (quoting *Frangione v. Township of Edison*, Civ. No. 06-2046, 2008 WL 2565104, at *3 (D.N.J. June 24, 2008)). Voting for an individual is also an expression of association with a particular candidate. *See Berg v. Egan*, 979 F. Supp. 330, 336 (E.D. Pa. 1997) (explaining that "the free association right implicated when a candidate's name is removed from the ballot if the free association right of the voter who wishes to associate with the candidate by casting his or her vote in the candidate's favor" (citing *Bullock v. Carter*, 405 U.S. 134 (1972)).

Here, the plaintiff, despite asserting that Lackawanna County policy prevented him from being a "vocal supporter" of a candidate, attended a political function in the nature of a golf outing for The Friends of Wansacz and O'Brien in mid-September 2011.  *See* Eastman Dep. Tr. at 109-18.  He acknowledged that the $250 check that he wrote to this political committee went (at least in part) towards supporting O'Brien and Wansacz to get elected.  *Id.* at 116-17, 118.  He saw O'Brien and Wansacz while at the outing, they thanked him for coming, and he even had his picture taken with them.  *Id.* at 118-19.

In addition to these overt demonstrations of political support for Wansacz and O'Brien, the plaintiff decided that he also would pay $150 to The Friends of Wansacz and O'Brien to attend Wansacz and O'Brien's inauguration party in January 2011.  *Id.* at 119-20. Approximately 400 to 500 people attended the party, and the plaintiff brought his wife to the event as well.  *Id.* at 120.  Once again, the plaintiff and his wife saw O'Brien and Wansacz at the event, had them thank him for coming and indicate that they enjoyed meeting his wife.  *Id.* at 120.

The plaintiff's explanations for these contributions; namely, that he attended the golf outing "to play golf, enjoy a meal and network," or that he attended the inauguration party simply to show "respect for his bosses," could not change these association to non-association because by the acts' very nature, they (in particular the attendance and contribution for the golf outing, a campaign event) constitute forms of association.[19]  The plaintiff has not cited to any case indicating that somehow his alleged intent could change otherwise overt acts of political association to non-association and any such attempt would be inconsistent with the prevailing law in this country in First Amendment cases.  *See, e.g.*, *Federal Election Comm'n v. Wisconsin*

---

[19] To the extent that the plaintiff might be attempting to argue that he did not want Wansacz and O'Brien to win the election; this argument is belied by his acknowledgement that he voted for them despite the fact that it is unclear whether he was living in Lackawanna County at the time of the election.

*Right to Life, Inc.*, 551 U.S. 449, 467-69 (2007) (rejecting to adopt a test for as-applied

challenges to political speech that would "turn[] on the speaker's intent to affect an election"

because, *inter alia*, "[f]ar from serving the values the First Amendment is meant to protect, an

intent-based test would chill core political speech by opening the door to a trial on every ad . . .

on the theory that the speaker actually intended to affect an election, no matter how compelling

the indications that the ad concerned a pending legislative or policy issue").

       In addition, while the plaintiff attempts to create a classification of non-association by

designating his activities as not constituting "active political associations," he has not cited any

relevant legal support for this principle and this court has found none.   He also designates his

activities as not constituting "active political associations" despite conversely characterizing

Lenceski's actions in relation to this particular political campaign, namely a $500 campaign

contribution prior to the primary election and attendance at one unknown-type of political event,

as active political association.[20]   The plaintiff provides no legal support for the differences in his

characterizations.   Moreover, contrary to the plaintiff's assertion, simply because he did not

attend any other political events, use bumper stickers, post campaign yard signs, work at the

---

[20] Lenceski's personal political support of Wansacz (there is no evidence that he expressly supported O'Brien) in the county commissioner's race was very similar to the plaintiff's support, especially considering the prohibitions from participating in political activity that the plaintiff believed were on him because he was a county employee. Both men attended a campaign event and contributed money toward the campaign.  The plaintiff asserts that Lenceski's donation of $500, under what he characterizes as difficult financial circumstances for Lenceski at the time, rendered him as a "large donor," *see* Pl.'s Br. at 11, whereas the plaintiff, who gave $250, only somehow provided marginal support.  *Id.* at 16.
       The greater distinction between the two men, per the plaintiff, was Lenceski's maintenance of a friendship with Wansacz's wife, with whom he attended high school, the fact that Wansacz currently lives in the same town as Lenceski, Wansacz's visit to Lenceski's mother's house (while Lenceski resided there) during a prior campaign, and Lenceski's attendance at Wansacz's house for a New Year's Eve party years ago. *Id.* at 11-12; *see also* Lenceski Dep. Tr. at 50.
       The plaintiff also references campaign contributions by Lenceski's uncle, Ron Koldjeski ("Koldjeski"), to O'Brien's campaign for county commissioner in 2007. Pl.'s Br. at 11.  It appears that he gave almost $9,000 to that campaign.  Pl.'s App. at Exs. 11, 12.  The plaintiff has attempted to link these contributions to O'Brien's decision to hire Lenceski despite (1) the contributions occurring in 2007, (2) Lenceski testifying that he did not tell Koldjeski that he was applying for county employment, *see* Lenceski Dep. Tr. at 39, (3) no evidence in the record showing that O'Brien or Wansacz knew Lenceski was Koldjeski's nephew, and (4) O'Brien's testimony that he never saw Koldjeski prior to his job interview, *see* O'Brien Dep. Tr. at 97-98.

polls, or make phone calls, *see* Pl.'s Br. at 16 & n.6, these lack of additional acts of political support would not take away from or change the nature of his acts of support.[21]   Therefore, the plaintiff has not created a jury issue by attempting to subvert his acts of expressive association into non-association through an examination of his subjective intent or an examination of his other acts.[22]

Concerning the cases that the plaintiff references in support of his arguments that he engaged in constitutionally protected conduct, the plaintiff has rendered our review of his arguments somewhat difficult by not separately discussing the second and third elements of the *prima facie* case in his brief.   Nonetheless, two of the cases he appears to cite to buttress his argument that he did not support O'Brien and Wansacz are easily distinguishable. In the first case, *Heffernan v. City of Paterson*, 2 F. Supp. 3d 563 (D.N.J. 2014), the plaintiff references it for the principle that marginal support of a candidate is actually non-association as a matter of law.   In *Heffernan*, the mother of the plaintiff, a detective in the City of Paterson's Police Department, asked him to pick up a lawn sign supporting the candidacy of an individual for mayor.  2 F. Supp. 3d at 566.  The plaintiff was a close friend of this candidate.  *Id.* at 567. While off duty, the plaintiff and his son traveled to a location and obtained the sign from a local councilman who was supporting this individual's campaign.   *Id.* at 566.   At some point thereafter, the plaintiff delivered the sign to his mother, but he did not display the sign or post it on his mother's property.  *Id.* at 567.

At the time the plaintiff obtained the sign, a member of the then-mayor's security detail observed the plaintiff.  *Id.* at 566-67.  The next day, a police lieutenant informed the plaintiff that

---

[21] Interestingly, the plaintiff references "other political events," apparently recognizing that the golf outing and/or the inauguration party would be considered as political events.  Pl.'s Br. at 16 n.6.

[22] Despite the plaintiff's testimony regarding his alleged motivation for participating in the golf outing and the inauguration event, he affirmed that he was there to "support" O'Brien and Wansacz.  *See* Eastman Dep. Tr. at 108-17.

he was being transferred out of the office and demoted to walking patrol. *Id.* at 567. Based on the demotion, the plaintiff brought an action against the city, the mayor, the city's police chief, and the city's police director because they allegedly retaliated against him for his exercise of his First Amendment freedoms of speech and association. *Id.* at 566.

The defendants moved for summary judgment claiming that the plaintiff had not engaged in any protected speech and he had not properly asserted a freedom of association claim. *Id.* at 569. With respect to the freedom of association claim, the district court determined that there was no genuine issue of material fact as to whether the plaintiff associated himself with the mayoral campaign because his acts of picking up the sign for his mother or his "passive well-wishing based on friendship" were not done "with the intent of furthering the goals of the campaign or promoting a message." *Id.* at 579. Instead, the plaintiff "merely picked up the sign as an accommodation to his ailing mother, and he has never claimed otherwise." *Id.* at 579-80.

*Heffernan* is distinguishable from the facts in this case because the court there had to essentially examine whether a public employee's act in picking up yard signs for his mother, without any other action relating to the mayoral campaign, could constitute a form of association. Here, we are not dealing with an issue as to whether the plaintiff's conduct in contributing to O'Brien and Wansacz's campaigns and attending their campaign golf outing, voting for them, and attending their inauguration party are acts of association. In particular, the attendance at the golf outing and submitting a campaign contribution through that event, are clearly acts of active political association with a candidate. Thus, unlike in this case, *Heffernan* did not involve **any** support of a candidate, much less marginal support.

The second case referenced by the plaintiff and requiring more specific attention is *Wuestling v. Lackawanna County*, No. 3:12-CV-660, 2013 WL 785260 (M.D. Pa. Mar. 1, 2013).

In *Wuestling*, the plaintiff, Kent Wuestling ("Wuestling") worked in Lackawanna County's parks and recreation department until O'Brien and Wansacz terminated his employment and replaced him with an individual that contributed money to the defendants' campaigns. 2013 WL 785260 at *1. Wuestling alleged that unlike his replacement, he had only provided *de minimis* financial support and political support to the defendants. *Id.*

The defendants moved to dismiss the complaint arguing that, *inter alia*, Wuestling did not include sufficient allegations to establish a *prima facie* case insofar as he did not engage in constitutionally protected conduct, *i.e.* non-association, because he had provided O'Brien and Wansacz with financial support and had signed O'Brien's nominating position. *Id.* at *3. Judge Connor rejected the defendants' arguments because Wuestling had alleged that the defendants terminated his employment because of a lack of political support as evidenced by being replaced with a known political supporter. *Id.* (citing *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987)). Nonetheless, Judge Connor also noted the following:

> The court must make the determination of whether merely signing a nomination petition and providing "marginal" or *de minimus* financial support constitutes "political support" in the context of all of the facts. Defendants are free to explore this issue in discovery and to reassert these arguments in the form of a Rule 56 motion. Pertinent facts will include the precise amount of financial support or in-kind contribution which Wuestling provided to O'Brien and Wansacz as well as any other factors that may have influenced O'Brien and Wansacz's termination decision.

*Id.* at *4.

Even if Judge Connor's well-reasoned analysis of the issue was binding on this court, which it is not, Judge Connor left open the determination as to whether Wuestling's actions constituted political support under the law. He appears to also have left opened the question as to whether Wuestling could show that he was not associated with the defendants. Here, we have a full and complete evidentiary record showing that the plaintiff went beyond what Wuestling

did (to the extent such a comparison is appropriate).   At a minimum, the plaintiff attended a political event and provided a $250 campaign contribution (even if some of it went towards greens fees or other expenses).   He attended an event with other individuals presumably supporting the campaigns of O'Brien and Wansacz.   Thus, again, he cannot show non-association.

The court recognizes that the Third Circuit has concluded that constitutionally protected conduct in the form of a failure to support a candidate can be demonstrated by a "demotion to make positions available for political supporters." *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir. 1987).   Contrary to the plaintiff's apparent argument, *Bennis* does not stand for the proposition that a plaintiff can avoid showing that he or she exercised a constitutional right if he or she can show that action was taken (or not taken) to "make room" for a political supporter of a defendant.   Instead, the *Bennis* court determined that in certain cases, a defendant's action to make room for the defendant's political supporters could establish this second element of the *prima facie* case because it could implicitly show a failure to support, which is an exercise of freedom of association.   *Id.*   While the plaintiff alleges that he was terminated to "make room" for Lenceski, a political supporter of Wansacz, which would seem to fall under *Bennis*, the facts here are dissimilar because a reasonable jury could not infer a failure to support when, in fact, the plaintiff supported O'Brien and Wansacz.   Accordingly, based on the record taken as a whole, no rationale factfinder could conclude that the plaintiff had engaged in constitutionally protected conduct in the nature of non-association with O'Brien and Wansacz.

**2.   The Defendants' Conduct Was Not a Substantial or Motivating Factor in the Employment Decision**

The defendants also contend that the plaintiff cannot establish the third and final element of the *prima facie* case because he cannot demonstrate that his engagement in constitutionally

26

protected conduct was a substantial or motivating factor for O'Brien's and Wansacz's employment decision. Defs.' Br. at 13. With regard to this final element, "'implicit in th[is] prong is a requirement that the plaintiff produce sufficient evidence to show [that] the defendant knew of [the] plaintiff's political persuasion,' which requires proof of both knowledge and causation." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 275 (3d Cir. 2007) (quoting *Goodman v. Pennsylvania Turnpike Comm'n*, 293 F.3d 655, 664 (3d Cir. 2002)).

The defendants argue that the evidence unequivocally shows that O'Brien and Wansacz had no knowledge that the plaintiff did not support them in their campaigns for county commissioner. Defs.' Br. at 13. In addition, they point out that the plaintiff admitted that he never informed O'Brien or Wansacz he did not support them or that they would have any reason to believe that he did not support them. *Id.* As he did in fact support them, the defendants assert that the plaintiff has not established this final element. *Id.*

The plaintiff claims that the defendants arguments "miss[] the point." Pl.'s Br. at 20. He asserts that

> [k]nowledge of the plaintiff's political affiliation or association is important in cases in which an employee is terminated for actively supporting the defendant politician's opponent. In that type of case, a termination cannot logically be for association with an opponent if the defendant does not know of that association.
>
> In replacement cases like the present case, in which an employee is terminated in order to make room for a person who associates with the decisionmaker defendant (a patronage hire), the defendant would necessarily know that the person he chooses for the job was a political or personal supporter. ***The defendant would know of the absence of such support from the plaintiff,*** and the absence of a close relationship. Sworn testimony as to such knowledge should therefore be unnecessary.

*Id.* at 20-21 (emphasis added). Thus, the plaintiff's argument essentially amounts to his assertion that he satisfies this final element because the evidence shows that Wansacz and/or O'Brien

knew that Lenceski supported Wansacz, and they knew that the plaintiff was not close to either of them. *Id.* at 21.

While the plaintiff presents a persuasive argument regarding the importance of knowledge of a public employee's political affiliation in a failure to support case, he has cited no Third Circuit authority to support this assertion. The only case cited by the plaintiff in support of this proposition, *Conjour v. Whitehall Township*, 850 F. Supp. 309 (E.D. Pa. 1994), is also not dispositive.[23] In this regard, although *Conjour* may have referenced the defendants' lack of knowledge as not being dispositive when reviewing the plaintiff's First Amendment political patronage claim, that lack of knowledge related to the plaintiff not supporting (or failing to support) the new township executive. Here, there is nothing in the record by which O'Brien or Wansacz would believe, contrary to the plaintiff's attendance at their political event (and even his attendance at their inauguration party), that he did not support or that he had failed to support them politically. Therefore, there is no genuine issue of fact as to whether the plaintiff's political association with Wansacz and O'Brien could have been a substantial or motivating factor in the decision to terminate his employment with the county.

### III.   CONCLUSION

Presuming that the plaintiff has demonstrated that he was employed in a position as Lackawanna County director of public works that did not require political affiliation, he still

---

[23] In *Conjour*, the plaintiff, the former Whitehall Township chief of police, claimed that he was replaced as chief of police by the new township executive because of his political affiliations or his lack of support for the new executive. 850 F. Supp. at 313, 316-17. The defendants, the township and the new executive, moved for summary judgment arguing that, *inter alia*, the plaintiff could not satisfy the third element of the *prima facie* case because the new executive did not know of his political affiliation. *Id.* at 317. The court denied the motion after explaining that "the fact that the plaintiff was not politically active, and that in fact the defendants' may not have known of plaintiff's affiliation, is not dispositive of plaintiff's First Amendment claim." *Id.*

The district court then explained that the plaintiff must still prove that political affiliation was a "'substantial and motivating factor'" in his termination. *Id.* (quoting *Bennis*, 823 F.2d at 732). In examining this element, the court reviewed the evidence in the record, which showed that the new executive attempted to replace the plaintiff as chief of police with one of her friends that had supported her campaign. *Id.* The court determined that this record created a disputed issue of material fact that "protected activity was a substantial or motivating factor in the employment decision." *Id.*

cannot establish a *prima facie* case of political patronage discrimination because no reasonable jury could conclude that (1) he engaged in constitutionally protected activity, and (2) his exercise of constitutionally protected activity in the nature of supporting Wansacz and O'Brien was a substantial or motivating factor in terminating his employment as the director of public works. The court's disposition of these claims also moots the plaintiff's claim against the county and his claim for punitive damages.   *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (explaining that a constitutional claim under 42 U.S.C. § 1983 can generally not lie against a governmental body unless an individual employee has violated a plaintiff's constitutional rights). Therefore, the court will grant the defendants' motion for summary judgment.[24]

 An appropriate order follows.

BY THE COURT:

_____
EDWARD G. SMITH, J.

---

[24] As indicated above, because of the court's analysis of the evidence as relating to the second and third factors of the *prima facie* case, the court did not need to address the defendants' compelling argument that the plaintiff's cabinet-level position as director of public works was a position for which party affiliation was an appropriate requirement for the effective performance of this position. Through the plaintiff's own deposition testimony, he has shown that he had meaningful input into decision-making concerning the nature and scope of a major township program. *See Brown v. Trench*, 787 F.2d 167, 169 (3d Cir. 1996) (describing key factor in examining whether a public employee's position falls within exemption from First Amendment protection set forth in *Branti v. Finkel*, 445 U.S. 507 (1980)). Nonetheless, the court also recognizes that the plaintiff identified testimony from the county's representative that this position did not require political affiliation.

 Additionally, the court's conclusion that there are no genuine issues of fact as to whether the plaintiff has established a *prima facie* case of political patronage discrimination, renders moot any discussion as to whether the defendants could show that they would have still reached the same decision to terminate the plaintiff's employment, hire Lenceski, and restructure the positions. Furthermore, the court need not address the defendants' claims of qualified immunity or legislative immunity.